IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ERNEST A. SWINSON,       )
                              )
       Petitioner,      )
                              )
      v.                 )        Case No. 4:05CV1918 CDP (AGF)
                              )
CHUCK DWYER,        )
                              )
       Respondent.    )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on the petition of Missouri state prisoner Ernest A. Swinson for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The action was referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth below, the Court recommends that habeas relief be denied.

Petitioner was found guilty by a jury on July 11, 2001, of second degree murder, for which he was sentenced on September 21, 2001, to 20 years imprisonment. The charge arose out of the January 22, 2000 death of Petitioner's six-week old son, Tyson, by violent shaking. The conviction was affirmed on direct appeal on December 10, 2002. On April 7, 2003, Petitioner filed a pro se motion for post-conviction relief in state court, and on July 7, 2003, appointed counsel filed an amended motion. This motion was denied on September 23, 2003, and the denial was summarily affirmed on appeal on October 19, 2004.

The present petition for federal habeas relief was filed on October 20, 2005.

Petitioner claims that his constitutional rights were violated in the following ways:

(1) his conviction was obtained in violation of his privilege against self incrimination, by using statements he made during custodial interrogations at his home and at a hospital, prior to being advised of his <u>Miranda</u> rights[1];

(2) defense counsel rendered ineffective assistance by failing to present evidence that would have created a reasonable doubt, to investigate the case, "to file MAI [Missouri Approved Instruction] motions," to call witnesses, to challenge the state's evidence and witnesses effectively, and to inform Petitioner that charges against him had been changed and that he was considered a prior offender;

(3) the trial court failed to suppress evidence obtained from unlawful searches and seizures;

(4) the prosecutor obtained the testimony of a state witness (Nikki Wells) by means of promises and threats;

(5) police targeted Petitioner and failed to properly investigate other suspects; and

(6) the trial court denied Petitioner's rights to a bond, to a bench trial, and to act as his own co-counsel; allowed the State to change charges without presenting new evidence or allowing defense counsel to object; allowed the hearsay testimony of a police detective (Jody Rask) regarding a statement made to her by a doctor (Dr. Ramaiah), in violation of Petitioner's right to confront witnesses; and allowed another doctor to demonstrate with a toy doll how a baby would be shaken violently in shaken baby death incidents.

Respondent argues that the petition should be dismissed because all of

---

[1]    <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), requires police to advise a criminal suspect of the following right before a custodial interrogation: You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have a right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements.

Petitioner's claims, with the exception of his claims regarding the admission of statements that Petitioner made at the hospital and that Dr. Ramaiah made to Detective Rask, were procedurally defaulted in the state courts, and the properly preserved claims were reasonably adjudicated by the state courts.

## BACKGROUND

### Suppression Hearing

On July 3, 2001, a pretrial evidentiary hearing was held on Petitioner's motion to suppress statements he had made. Four police officers testified at the hearing. Officers Duncan Shanklin and Lamont Jones testified that on January 21, 2000, they went to Gwendolyn Wells's home in response to a 911 call reporting that a baby was not breathing. They were met at the door by Gwendolyn Wells, who was carrying Tyson and administering CPR to him. Gwendolyn Wells is the mother of Petitioner's girlfriend, Nikki Wells, and Petitioner and Nikki Wells lived in the basement of the house with their two young sons, Tyson and 17-month old Tajuan. Also living in the house were Gwendolen Wells's boyfriend and another daughter.

Officer Shanklin testified that he took the baby and continued administering CPR until medics arrived and took Tyson to the hospital. Officer Shanklin testified that he then talked to Petitioner in the basement and asked him what had happened. Petitioner stated that prior to the officers' arrival, Tyson had fallen between the bed and the wall. Petitioner told Officer Shanklin that he placed Tyson on the bar and then saw that Tyson was not breathing, so he called up to Gwendolyn Wells who told him to bring Tyson up and call 911. Officer Shanklin testified further that Petitioner told him about a second fall

Tyson had recently experienced. Officer Shanklin testified that he indicated to Petitioner that he was free to leave, and that Petitioner was not handcuffed. (Resp. Ex. A at 12-20.)

Officer Jones testified that after Tyson was taken to the hospital, he also questioned Petitioner to find out what had happened. Petitioner, who had not been put in handcuffs, related that he was sleeping in the basement with the two boys and woke up at approximately 8:00 when Gwendolyn Wells called down to ask why Tyson was crying. Petitioner and the boys went back to sleep and Petitioner next woke up at approximately 1:00 p.m. He changed Tyson's diaper, put him back in the crib, and went upstairs. When he went back downstairs he picked Tyson up and saw that he was not breathing. According to Officer Jones, Petitioner stated that he then shook Tyson to try to get a response and that when he did not get a response, he took Tyson upstairs to Gwendolyn Wells. Petitioner then told Jones that one day earlier, Tyson had fallen between the crib and the bed onto the floor on his face. Detective Jones testified that Detectives from homicide then arrived and Officer Jones had no further contact with Petitioner. Id. at 20-28.

Detective Marla Arinze of the homicide unit testified that she and other homicide officers secured the scene from the first responding officers. She testified that Petitioner told her that on the previous day, Tyson had fallen between the crib and bed and injured his mouth. Petitioner further stated that on the current day, he woke at about 8:00 a.m. when Gwendolyn Wells called down to ask why Tyson was crying. Petitioner fed Tyson, put him back to sleep, fell asleep again, woke at about 1:00 p.m., and saw that Tyson was not breathing. Id. at 7-11.

Detective Rask, who worked in the police department's child abuse unit, testified that she got a call on the day in question to go to the hospital to which Tyson had been brought in critical condition. Detective Rask testified that Dr. Ramaiah, who was treating Tyson, wanted to speak with the person who was in charge of Tyson when he stopped breathing and so Petitioner was transported to the hospital by two police officers. Petitioner was handcuffed during the transport in accordance with usual police policy, but the handcuffs were removed once he got to the hospital. Dr. Ramaiah then took Petitioner to a room and questioned him about the injuries to the baby. Detective Rask and the two police officers who transported him to the hospital were in the room during Dr. Ramaiah's discussion with Petitioner. Id. at 29-31.

Detective Rask testified that she did not ask Dr. Ramaiah to speak with Petitioner and did not suggest any questions to be asked. Detective Rask further testified that Petitioner told Dr. Ramaiah that on the previous day, Tyson had fallen off the bed and that Petitioner speculated that Tajuan had rolled Tyson off the bed. Petitioner told Dr. Ramaiah that between 8:00 and 9:00 a.m. of the morning in question, he woke up when Gwendolyn Wells called downstairs to ask why Tyson was crying. Petitioner saw that Tyson had fallen back asleep and Petitioner also went back to sleep and woke up next between 12:00 and 1:00 p.m. Petitioner changed Tyson and took Tajuan upstairs and fed him. When Petitioner came back downstairs to check on Tyson, he noticed that Tyson was not breathing. Petitioner tried to do CPR and told Gwendolen Wells to call 911. Id. at 31-32.

Detective Rask testified that Dr. Ramaiah then asked her to step outside, and in the

hallway told her that the history given by Petitioner was not consistent with Tyson's injuries. The detectives then put Petitioner in handcuffs and took him to the police station where Detective Rask read him his <u>Miranda</u> rights. Detective Rask testified that Petitioner signed a warning and waiver form and agreed to make a statement. He told Detective Rask that what he had told Dr. Ramaiah was accurate, except that he had left out a few things. He then added that he had shaken Tyson to get a response after he found him not breathing. After making his statement, Petitioner was released. The next day, Tyson was pronounced dead and a few days thereafter the medical examiner ruled it a homicide. Following the ruling by the medical examiner, Detective Rask asked Petitioner to come in for further questioning. <u>Id.</u> at 32-36.

Detective Rask continued that Petitioner came to the station as asked and was again advised of his <u>Miranda</u> rights and again signed a warning and waiver form. When Detective Rask told Petitioner that the medical examiner had determined that Tyson's death was a homicide and that Tyson had suffered a blunt trauma to his head and broken ribs, Petitioner stated that what really happened on January 22 was that he saw Tajuan hitting Tyson on the forehead with a glass baby bottle. Petitioner also explained that he (Petitioner) was a wild sleeper and might have struck Tyson with his arms while Tyson was sleeping in the bed with him. Petitioner stated that when he shook Tyson, maybe he shook him harder than he realized. When asked about the rib injuries, Petitioner stated that Tajuan stepped on Tyson "all the time." <u>Id.</u> at 36-39.

Dr. Ramaiah was not listed as a witness for the state, and after the suppression hearing, Petitioner filed a motion in limine to preclude any state's witness from testifying

to Dr. Ramaiah's statement that the injuries suffered by Tyson were not consistent with the history Petitioner gave to Dr. Ramaiah. Petitioner argued that such testimony would be inadmissable hearsay, prejudicial, and in violation of Petitioner's constitutional right to confront witnesses. (Resp. Ex. B at 48.) The trial court denied Petitioner's motion to suppress the statements he had made at the house and hospital, as well as the motion in limine regarding Dr. Ramaiah's statement. Id.[2]

**Trial**

In opening statement, the prosecutor, over defense counsel's objection, summarized the conversations with Dr. Ramaiah, including Dr. Ramaiah's statement that the injuries Tyson suffered were not consistent with Petitioner's story of what had happened. The prosecutor told the jury that Dr. Ramaiah was not available to testify, but that a Dr. Paschall, who reviewed the medical records, would be testifying about Tyson's injuries. Id. at 176-77. At trial, the police officers who testified at the suppression hearing testified consistent with their testimony at the hearing. Defense counsel objected, based on his previous motions, to the testimony related to Petitioner's statements to Dr. Ramaiah and Dr. Ramaiah's statements to Detective Rask, which objections were overruled. Id. at 270-71, 273. Defense counsel did not request, nor did the court give, a limiting instruction as to the permissible use by the jury of Dr. Ramaiah's out-of-court statement. In cross-examination of Detective Rask, defense counsel referenced Dr.

---

[2] The trial court's reasoning in denying these motions is not apparent in the record before the Court. The word "denied" is handwritten on the motion in limine; the record does not include evidence of when or why the motion to suppress was denied.

Ramaiah's statement to her at the hospital as part of the sequence of events leading to Petitioner being taken to the police station and read his right. Defense counsel established through cross-examination that Detective Rask did not know whether what Dr. Ramaiah said was true or untrue. Id. at 289-90. Dr. Ramaiah's challenged statement was not mentioned by the prosecutor in closing argument.

Robert Paschall, M.D., an expert in pediatrics and child physical abuse, described the injuries that were noted in Tyson's medical record. He further testified that those injuries were not consistent with falling off a bed, with being hit on the head with a baby bottle, or with resuscitative attempts, but were consistent with shaken baby syndrome. Over Petitioner's objection, Dr. Paschall demonstrated with a doll the kind of movement and force that would have been necessary to cause Tyson's injuries. Id. at 321-38.

The State also presented the testimony Mary Beth Karr, a criminalist with the police department, who testified, over Petitioner's hearsay objection, that the report prepared by Cheyenne Saunders, a former criminalist with the department, as well as Karr's own report, showed that Tyson's blood was on his baby blanket and crib bumpers. Id. at 298-313. Marilyn Kincaid, M.D., an expert in ophthalmology and pathology, testified that she examined Tyson's eyes following his death and observed injuries, which she described, that were consistent with shaken baby death. Id. at 363-69. And James Petterchak, M.D., the pathologist who had performed the autopsy on Tyson, testified that Tyson's death was a homicide, caused by closed head injury consistent with shaken baby syndrome. Id. at 373-84.

Petitioner testified at trial. He stated that on the day in question, he first woke up

at about 8:30 a.m. when Gwendolen Wells called down to the basement to ask why Tyson was crying. Petitioner gave Tyson his pacifier and they both fell asleep again. Petitioner testified that he woke up again at about 12:30 p.m., changed Tyson and played around for about one-half hour with Tajuan. He then saw Tajuan hitting Tyson with a glass baby bottle. Petitioner took Tajuan upstairs and when Petitioner went back downstairs a few minutes later, he noticed that Tyson was not breathing. Petitioner testified that he panicked, tried to do CPR, and tried to call 911 but could not get through. He then called his girlfriend and told her to come home because the baby was not breathing, ran upstairs with Tyson, and called 911 again and told them his baby was not breathing. After Tyson was taken to the hospital, Petitioner went to the basement to get dressed and five to eight police officers were in the basement asking him if he was the last person with the baby before he stopped breathing and whether he had shaken the baby. Petitioner testified that he told the police everything he could think of that happened to Tyson during the past few days, including Tyson's fall onto the floor. Id. at 407-16.

Petitioner testified that the police then put him in handcuffs to take him to the police station. He testified that the police told him that he was not under arrest and that it was standard procedure to bring the caretaker of a baby who stopped breathing to the police station for questioning, but that he was not free to go to the hospital. Petitioner testified that while on route to the station, a radio call came to bring Petitioner to the hospital. After he spoke with the doctors at the hospital, he was taken to the police station, where he was again told that he was not under arrest and that the police just wanted to question him, but that when he got up to leave, the police told him he had to

wait for Detective Rask to get there.  Id. at 417-18.

Petitioner testified that he gave the police a written statement and was allowed to leave.  A few days later, the police asked the family to return for more questioning and he and his family did so.  He was then confined.  Petitioner testified that he loved his children and that he did not shake Tyson in anger.  During his testimony, Petitioner mentioned that he had never been locked up.  On cross-examination, the State brought out that Petitioner had a 1997 felony conviction for forgery -- passing a bad check.  Id. at 418-21.

The jury was instructed that it was their duty to determine the facts and to determine them only from the evidence and the reasonable inferences to be drawn from the evidence, and that the opening statements of the attorneys were not evidence.  Id. at 58, 59.  The jury was instructed on first-degree murder and second-degree murder, and returned a verdict for second-degree murder.

**Direct Appeal**

Petitioner argued on direct appeal that the trial court erred in (1) overruling his objection to Detective Rask's testimony regarding the statement by Dr. Ramaiah that Petitioner's story was not consistent with Tyson's injuries; (2) denying Petitioner's motion to suppress Detective Rask's testimony regarding statements made by Petitioner to Dr. Ramaiah in the presence of the three police officers, in violation of Petitioner's constitutional rights against self incrimination and due process, because these statements were made during the course of what constituted a custodial interrogation prior to the police advising Petitioner of his right to remain silent; and (3) denying Petitioner's

motions for acquittal and for a new trial, because the conviction was not supported by sufficient evidence, but rather was based only on the facts that Petitioner was the last adult with Tyson before Tyson stopped breathing, that the nature of Tyson's injuries proved that he was injured by someone shaking him, and that Petitioner gave inconsistent statements regarding the events to police and Dr. Ramaiah, statements which should not have been admitted into evidence. (Resp. Ex. C.)

The Missouri Court of Appeals rejected all of Petitioner's claims. The appellate court first held that Dr. Ramaiah's challenged statement recounted at trial by Detective Rask was not inadmissable hearsay because it was not introduced to prove the truth of the matter asserted therein, but rather was introduced to offer an explanation of why Detective Rask subsequently took Petitioner to the police station and read him his rights, "supplying relevant background and continuity of action." The court reasoned that without this testimony, "the jury would have been left to speculate as to why [Petitioner] was taken to the station." (Resp. Ex. E at 4-5.)

The court next held that Petitioner's right against self-incrimination was not violated by admission of the statements he made to Dr. Ramaiah at the hospital prior to being advised of his Miranda rights. The court stated that if questioning is done by a private individual rather than a police officer or actor for the State, Miranda warnings are not required. The court concluded that Dr. Ramaiah was not acting for the State for several reasons: the police did not ask Dr. Ramaiah to question Petitioner, rather, Dr. Ramaiah, who was treating Tyson, wanted to question the last person who had seen Tyson before he stopped breathing as to the events that caused the injuries. Further, the

police did not pay Dr. Ramaiah to question Petitioner, and the officers in the room did not participate in the questioning. The court further concluded that even if Dr. Ramaiah was a State actor, Petitioner was not questioned as part of a custodial interrogation because Petitioner was not under arrest at that point or subject to arrest-like constraints. In fact, the police specifically told Petitioner while transporting him to the hospital that he was not under arrest. Id. at 6-8.

Lastly, the state appellate court held that, viewing the evidence in the light most favorable to the verdict, there was sufficient evidence from which a reasonable juror might have found Petitioner guilty of second-degree murder. Id. at 8-9.

## State Postconviction Proceedings

In a pro se motion for state postconviction relief filed on November 26, 2001, Petitioner claimed that his conviction should be set aside because copies of the indictment had three different case numbers. Petitioner also asserted that the trial court erred in denying Petitioner his right to a bench trial and to act as his own co-counsel; allowing the prosecution to change charges without following proper procedures; allowing Rask to testify as to what Dr. Ramaiah had told her; allowing Dr. Paschall, who had not been named as an expert, to testify and to demonstrate the amount of force that would have been needed to kill the victim; allowing Karr to testify as to the opinion of Saunders;[3] and denying Petitioner's motion to quash the indictment. Petitioner also complained that his trial counsel refused to file Missouri Approved Instructions requested by Petitioner,

---

[3]    Petitioner phrased this claim as the court allowing Saunders to testify as to Karr's opinion, but it is clear from the trial transcript that it was Karr who testified as to Saunders's opinion. (Resp. Ex. A at 304-05.)

refused to call Petitioner's family members as witnesses on Petitioner's behalf, and refused to contact an expert that Petitioner had found. (Resp. Ex. F at 12-25.)

In an amended motion filed by appointed counsel on July 7, 2003, the only claims specifically asserted were that Petitioner's trial counsel was ineffective in failing to adduce evidence of Petitioner's 1997 felony conviction of forgery on direct examination of Petitioner, rather than permitting the State "dramatically" to introduce such evidence for the first time on cross-examination of Petitioner; and in failing to request an instruction telling the jury that the prior conviction could not be considered as evidence that Petitioner was guilty of the offense for which he was on trial. The amended motion stated that it was incorporating by reference the claims raised in Petitioner's pro se motion. Id. at 32-54 .

The motion court only addressed the two claims specifically raised in the amended motion and found both to be without merit. The court noted that Petitioner's 1997 felony conviction for the "relatively minor crime of forgery (as compared to the charges [Petitioner] was facing)" did not come out "dramatically," as alleged. Rather, there was little discussion of the conviction and the State did not raise it again in closing argument. Further, Petitioner's statement on direct examination that he had never been locked up was never refuted. The Court found that there was no reasonable probability that the result of the trial would have been different had the 1997 felony conviction been disclosed by defense counsel, as there was overwhelming evidence supporting the verdict in the present case. The court similarly rejected the second claim in the amended motion. Id. at 56-70.

The only point raised by Petitioner on appeal from the denial of postconviction relief was that the motion court erred in rejecting the claim of trial counsel's ineffectiveness in failing to adduce evidence of the prior conviction during direct examination. (Resp. Ex. G.) The state appellate court summarily affirmed the denial of the motion for postconviction relief. (Resp. Ex. I.)

## DISCUSSION

**Procedural Default**

As noted above, Respondent argues that all of Petitioner's claims with the exception of part of his first claim (admission of his statements at the hospital to Dr. Ramaiah)[4] and part of his last claim (admission of Detective Rask's testimony regarding Dr. Ramaiah's statement to her)[5] are not properly before this Court because they were procedurally defaulted in State Court. This Court agrees.

Under the doctrine of procedural default, a state prisoner is generally barred from obtaining federal habeas relief on claims that were procedurally defaulted in state court, that is, claims that were not properly presented through "one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Wemark v. Iowa, 322 F.3d 1018, 1020-21 (8th Cir. 2003). A Missouri inmate procedurally defaults claims which should have been but were not raised on direct appeal or on appeal from the denial of a motion for postconviction relief. Moore-El v. Luebbers, 446 F.3d 890, 897-98 (8th Cir. 2006) (holding that a Missouri inmate's failure

---

[4]    Listed as claim A in the Petition.

[5]    Listed as claim J in the Petition.

to raise a claim on appeal from the denial of state postconviction relief constitutes a procedural default of that claim); Osborne v. Purkett, 411 F.3d 911, 919 (8th Cir. 2005) (same); Sweet v. Delo, 125 F.3d 1144, 1149-50 (8th Cir. 1997) (same as to claims not raised on direct appeal); Jolly v. Gammon, 28 F.3d 51, 53 (8th Cir. 1994) (stating that in Missouri, a claim must be presented at each step in the judicial process in state court to avoid procedural default).

Here, as Respondent argues, Petitioner did not present most of his claims for federal habeas relief to the Missouri Court of Appeals. These claims were thus procedurally defaulted in state court. A habeas petitioner can overcome the procedural bar to federal habeas review of defaulted claims by demonstrating (1) both cause for the default and actual prejudice therefrom, or (2) that the failure to review the federal claim will result in a fundamental miscarriage of justice; the "miscarriage-of-justice" exception permits review of a defaulted claim where a constitutional violation has probably resulted in the conviction of one who is factually "actually innocent." House v. Bell, 547 U.S. 518, 536-37 (2006) (citing Schlup v. Delo, 513 U.S. 298, 321-24 (1995)). To show a "miscarriage of justice" in this context requires "new reliable evidence" that was not presented at trial and that makes it "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Id.; see also Abdi v. Hatch, 450 F.3d 334, 338 (8th Cir. 2006).

Petitioner did not file a traverse addressing Respondent's procedural default argument, and this Court discerns no basis for excusing the default. Ineffective assistance of direct appeal counsel can be cause to excuse a procedural default of a habeas claim not

raised on direct appeal, but this theory itself must not have been procedurally defaulted in state court. Edwards, 529 U.S. at 446, 453 (2000); Watts v. Norris, 356 F.3d 937, 941 (8th Cir. 2004). Here this standard was not met, as no claim of ineffective assistance of direct appeal counsel was presented to the state courts in the postconviction proceedings.

In addition, as there is no constitutional right to counsel in state postconviction proceedings, the ineffective assistance of postconviction counsel, either in the motion court or on appeal, cannot constitute cause to excuse a procedural default. Interiano v. Dormire, 471 F.3d 854, 857 (8th Cir. 2006) (holding that Missouri prisoner's claim raised in his pro se state postconviction motion but not pursued by appointed counsel or raised on appeal from the denial of the motion was defaulted) (citing Osborne, 411 F.3d at 919-20); Winfield v. Roper, 460 F.3d 1026, 1034 (8th Cir. 2006). Nor has Petitioner offered new evidence in support of a claim of a miscarriage of justice. Thus, this Court is barred from considering the merits of Petitioner's claims other than his claims regarding the voluntariness of his statements to Dr. Ramaiah, and the admissibility of Detective Rask's testimony of Dr. Ramaiah's statement to her.

**Standard of Review of Claims Properly before the Court**

Under AEDPA, when a claim has been adjudicated on the merits in state court, an application for a writ of habeas corpus cannot be granted unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding.
28 U.S.C. § 2254(d).

The "contrary to" clause is satisfied if a state court has arrived at a conclusion opposite to that reached by the Supreme Court on a question of law or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent but arrives at the opposite result. Price v. Vincent, 538 U.S. 634, 640 (2003); Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court "unreasonably applies" clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413; Linehan v. Milczark, 315 F.3d 920, 924 (8th Cir. 2003). A case cannot be overturned merely because it incorrectly applies federal law, for the application must also be objectively unreasonable. Wright v. Van Patten, 128 S. Ct. 743, 747-48 (2008) (per curiam) (majority and concurring opinions); Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) ("Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.") (citation omitted).

The factual findings of the state court also may be challenged in a § 2254 petition, but they are subject to "an even more deferential review." Kinder v. Bowersox, 272 F.3d 532, 538 (8th Cir. 2001). Factual findings by the state court "shall be presumed to be correct," a presumption that will be rebutted only by "clear and convincing evidence." Id.; § 2254(e)(1). "The standard is demanding but not insatiable; . . . deference does not by

definition preclude relief." <u>Miller-El v. Dretke</u>, 545 U.S. 231, 240 (2005). In <u>Fry v. Pliler</u>, 551 U.S. 112, ___, 127 S. Ct. 2321, 2327 (2007), the Supreme Court explained that the more lenient "substantial and injurious effect" standard of review, rather than the "harmless beyond a reasonable doubt" standard, applies when a federal habeas court assesses the prejudicial impact of a federal constitutional error in a state criminal trial. Under this standard, habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" <u>Id.</u> (citation omitted).

**<u>Admission of Petitioner's Statements to Dr. Ramaiah</u>**

Petitioner argues that his constitutional right against self incrimination was violated by the admission of his statements to Dr. Ramaiah at the hospital, as testified to by Detective Rask. Under <u>Miranda</u>, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant" unless the defendant had been previously advised of his Fifth Amendment privilege against compulsory self incrimination. 384 U.S. at 444. The Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Id.</u> "It is the premise of <u>Miranda</u> that the danger of coercion results from the interaction of custody and official interrogation." <u>Illinois v. Perkins</u>, 496 U.S. 292, 296 (1990).

Here, as noted above, the state appellate court concluded that Petitioner's interview with Dr. Ramaiah was not a custodial police interrogation. The factual basis for the reasons relied upon by the court in support of this conclusion is supported by the testimony at the July 3, 2001 suppression hearing. The question remains whether the state court's decision

constituted a reasonable application of clearly established federal law.  See Yarborough v.

Alvarado, 541 U.S. 652, 664 (2004).  In Yarborough, the Supreme Court explained that this

is a general test, where substantial judgment is demanded in applying the law to the facts of

a given case; a federal habeas court, therefore, must provide ample leeway to a state court

in reaching a reasonable decision.  541 U.S. at 665.

> Two inquiries are involved in the "in custody" determination:
>
> first, what were the circumstances surrounding the interrogation; and second,
> given those circumstances, would a reasonable person have felt he or she was
> not at liberty to terminate the interrogation and leave.  Thus, the critical
> inquiry is not whether the interview took place in a coercive or police
> dominated environment, but rather whether the defendant's freedom to depart
> was restricted in any way.  In answering this question, we look at the totality
> of the circumstances while keeping in mind that the determination is based on
> the objective circumstances of the interrogation, not on the subjective views
> harbored by either the interrogating officers or the person being questioned.

Thompson v. Keohane, 516 U.S. 99, 112 (1995) (internal quotations and citations omitted);

see also United States v. Martinez, 462 F.3d 903, 909 (8th Cir. 2006).

An "interrogation" for purposes of Miranda includes any practices "'that the police

should know are reasonably likely to evoke an incriminating response from a suspect.'"

Arizona v. Mauro, 481 U.S. 520, 526-27 (1987)(quoting Rhode Island v. Innis, 446 U.S.

291, 301 (1980)).

Here, this Court concludes that a close question is presented as to whether the

questioning by Dr. Ramaiah may be considered a custodial interrogation.  The state court

reasonably found that the police did not initiate the interview in question and did not

prompt Dr. Ramaiah as to what to ask Petitioner, and that the purpose of Dr. Ramaiah's

questioning was related to her treatment of Tyson and not to whether Petitioner was guilty

of a crime. Further, Petitioner was specifically advised that he was not under arrest, and was not in handcuffs while at the hospital. On the other hand, Petitioner was transported to the hospital in handcuffs[6] and Detective Rask, who knew that Dr. Ramaiah would be asking Petitioner questions about what had happened to Tyson, and the two transporting police officers were in the room during the interview. Under the standard of review of § 2254, as elaborated upon in Yarborough for this context, the Court concludes that the state appellate court's decision does not involve an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States. Cf. Mauro, 481 U.S. at 527 (holding that after accused, who had confessed to killing his son, stated that he did not wish to talk further without a lawyer, no "interrogation" occurred when accused's wife was allowed to meet with him in the presence of an officer who tape-recorded the conversation, because there was no evidence that the wife was sent for the purpose of eliciting incriminating statements and it was unlikely that the accused would have felt that he was being coerced to incriminate himself).

Assuming, arguendo, the failure to suppress the statements in question was error, this Court concludes that it was harmless error. "The admission of statements obtained in violation of Miranda may constitute harmless error where there remains overwhelming independent evidence as to the defendant's guilt." Chavez v. Weber, 497 F.3d 796, 805

---

[6] As noted above, at trial, Petitioner testified that the officers were already en route with him to the police station when they were asked to go to the hospital. Although not as clear, the testimony of Detective Rask at the suppression hearing and at trial may fairly be read to suggest that the call to bring Petition to the hospital was received while Petitioner was still at the residence. (Resp. Ex. A at 30, 269-70.) The undersigned sees no express finding by the state courts as to this particular fact.

(8th Cir. 2007).  As noted above, in <u>Fry</u>, 127 S. Ct. at 2327, the Supreme Court explained

that the  "substantial and injurious effect" standard applies when a federal habeas court

assesses the prejudicial impact of a federal constitutional error in a state criminal trial.

Relevant factors in the inquiry include:

> (1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case.

<u>Toua Hong Chang v. Minnesota</u>, 521 F.3d 828, 833 (8th Cir.), <u>cert. denied</u>, 129 S. Ct 314

(2008).

Upon review of the record, the Court concludes that the test for substantial and

injurious effect was not met here.  The version of events that Petitioner related to Dr.

Ramaiah was quite similar to the versions he had recounted shortly beforehand to Officers

Shanklin, Jones, and Arinze, which the jury was properly allowed to hear.

**<u>Admission of Detective Rask's Testimony Regarding Dr. Ramaiah's Statement</u>**

Petitioner claims that the trial court violated his constitutional rights by overruling

his motion to preclude Detective Rask from testifying that Dr. Ramaiah told her that the

injuries suffered by Tyson were not consistent with the story Petitioner told Dr. Ramaiah.

Petitioner asserts this was inadmissible hearsay.  Petitioner further argues that because there

was no opportunity to cross-examine Dr. Ramaiah at trial, the state court violated the

Confrontation Clause by allowing this testimony.

The Sixth Amendment provides that "[i]n all criminal prosecutions, . . . the accused

shall enjoy the right . . . to be confronted with the witnesses against him."  In <u>Crawford v.</u>

Washington, 541 U.S. 36 (2004), the Supreme Court defined "witnesses" as those who "bear testimony." The Court then held that when a person makes out-of-court "testimonial statements," the Confrontation Clause attaches such that in a criminal prosecution, such statements are not admissible at trial unless the declarant is then unavailable and the accused has had a prior opportunity to cross-examine the declarant. 541 U.S. at 53-54. The Court stated that testimonial statements typically include "'solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact.'" Id. at 51. In Davis v. Washington, 547 U.S. 813 (2006), the Court expounded on what "testimonial" statements were, noting that they would include a declarant's unsworn statement to a note-taking police officer, made for the purpose of establishing some fact. 547 U.S. at 823-27 & n.1 (noting that statements made in the absence of any interrogation were not necessarily nontestimonial).

In strongly-worded dicta, the Crawford Court qualified the rule for testimonial statements, explaining that even if the statements at issue were testimonial, if they were not hearsay, the Confrontation Clause is not implicated by their introduction into evidence. "The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Id. at 60, n. 9 (citing Tennessee v. Street, 471 U.S. 409, 414 (1985)). Thus, if out-of-court testimonial evidence is not hearsay, the Confrontation Clause is not implicated. United States v. Tucker, 533 F.3d 711, 714-15 (8th Cir. 2008). Here, the state appellate court held that Dr. Ramaiah's statement in

question was not hearsay, and did not consider whether the statement was testimonial.[7]

As noted above, the state appellate court reasoned that the challenged testimony by Detective Rask was not hearsay because it was not introduced to prove the truth of the matter asserted therein, but was rather introduced to offer an explanation of why Detective Rask subsequently took Petitioner to the police station and read him his rights. This is consistent with the manner in which the evidence was introduced and used at the suppression hearing (Resp. Ex. A at 33, 40); in the prosecution's case in chief, id. at 273; and by defense counsel in cross-examination of Detective Rask at trial, id. at 289-90.

The appellate court's conclusion that the statement was not offered for its truth is somewhat troubling, however, as the prosecution appeared to reference Dr. Ramaiah's statement for the truth of the matter asserted therein in its opening statement. Id. at 177. And when elicited on direct examination, no limiting instruction was given. The jury was told, however, that opening statement is not evidence and there is no evidence that defense counsel requested a limiting instruction. In sum, even if in its independent judgment, this Court were to conclude that the state appellate court's determination on this matter applied federal law incorrectly, due to the absence of a limiting instruction, the Court cannot say that the state appellate court's adjudication of this claim was "objectively unreasonable" as required to warrant federal habeas relief. See United States v. Taylor, 509 F.3d 839, 850 (7th Cir. 2007) (rejecting Crawford claim based upon statement made by co-defendant's attorney during closing argument; "As every jury is instructed, lawyers' statements are not

---

[7]     That the state courts did not address the "testimonial" nature of the statement is not surprising, as those courts were presented with the issue prior to the Supreme Court's decision in Crawford.

evidence.").

Further, even if the admission of Detective Rask's testimony regarding Dr. Ramaiah's statement at issue violated Petitioner's Sixth Amendment rights as defined by Crawford, the Court concludes that this was harmless error, see Lilly v. Virginia, 527 U.S. 116, 140 (1999) (applying harmless error analysis to federal habeas petitioner's Confrontation Clause claim), in light of the other strong evidence to the same effect, namely the testimony of Drs. Paschall, Kincaid, and Petterchak. Moreover, the statement was not mentioned at closing, and defense counsel was able to establish through cross-examination of Detective Rask that she (Detective Rask) did not know whether what Dr. Ramaiah had said was true or untrue. See Toua Hong Chang, 521 F.3d at 833 (affirming the denial of habeas relief where admission of statements challenged under the Confrontation Clause did not have substantial and injurious effect on the verdict).

## CONCLUSION

The Court concludes that Petitioner's claims are without merit. The Court does not believe that reasonable jurists might find the Court's assessment of the procedural and substantive issues in this case debatable or wrong, for purposes of issuing a Certificate of Appealability under 28 U.S.C. § 2253(c)(2). See Slack v. McDaniel, 529 U.S. 473, 484-85 (2000) (setting forth the standard for issuing a Certificate of Appealability); Langley v. Norris, 465 F.3d 861, 862-63 (8th Cir. 2006) (same).

Accordingly,

**IT IS HEREBY RECOMMENDED** that the petition of Ernest A. Swinson for habeas corpus relief be **DENIED** as without merit.

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability not be issued in this case.

The parties are advised that they have ten (10) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that the failure to file timely objections may result in a waiver of the right to appeal questions of fact.


AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of February, 2009.